FILED _____ LODGED
_____ RECEIVED _____ COPY

SEP 26 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

Thomas O. Park, Plaintiff in Pro Se
10827 S. Calle Verde
Yuma, Arizona 85367
Phone: 928-345-0400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| THOMAS O. PARK, *real property owner* & ) | Case no.  CV-18-3039-PHX-DJH |
| ) | |
| MIKE JOHANNES, *trustee ad litem* ) | CIVIL ACTION |
| ) | |
| **Plaintiffs,** ) | ***QUIET TITLE*** |
| ) | |
| vs. ) | ***SLANDER OF TITLE*** |
| ) | |
| Wells Fargo Bank, N.A., ) | ***BREACH OF FIDUCIARY*** |
| 420 Montgomery Street ) | ***MORTGAGE COVENANT*** |
| San Francisco, California 94104 ) | |
| ) | |
| Structured Asset Mortgage Investments II ) | ***WRONGFUL USE OF CIVIL*** |
| Inc. 383 Madison Ave N.Y. 10179 ) | ***PROCESS BY A STATE*** |
| *ex rel Green Point Mortgage Funding Trust* ) | ***OFFICIAL (CIVIL RIGHTS)*** |
| *Series 2005-AR4* , SEC # 1334842 ) | |
| ) | [ Re: 10827 S. Calle Verde, Yuma AZ 85367] |
| JP Morgan Chase Bank, N.A. ) | |
| Attn: Jennifer A. Stevens, VP, AGC ) | [ Re:  T&B Trustee Sale # 14-05954 ] |
| 8181 Communications Parkway, Bldg. C, ) | |
| Plano, TX 75024 ) | [ Re:  Chase Bank Loan # 0012060042 ] |
| ) | |
| Tiffany & Bosco, P.A. ) | |
| Mark S. Bosco, Esq. ) | **30-DAY NOTICE TO PLEAD** |
| Leonard J. McDonald, Esq. ) | |
| 2525 E. Camelback Road  7th Floor ) | **DEMAND FOR TRIAL BY JURY** |
| Phoenix, Arizona 85016 ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

1

## COMPLAINT IN QUIET TITLE AND FOR DAMAGES, DECLARATORY JUDGMENT, RESTRAINING ORDER AND EQUITABLE RELIEF

1.      This is an action seeking "Quiet Title" and "Damages" for Breach of

Fiduciary Mortgage Covenant, and for Slander of Real Property Title.

2.      This is an action further seeking "Declaratory Judgment" regarding the

nature of "Arizona State Forcible Detainer Law" and it's application "following

foreclosure" as under A.R.S. § 12-1173.01(A)(5).

3.      This is additionally an action seeking an Injunction against State Court

proceedings based on the findings of this case, and the equitable imposition of a

"Constructive Trust" relating to the certain real estate in Yuma County Arizona,

asserting the "Equity of Redemption" against the underlying mortgage or deed of

trust, securing a mortgage obligation.

4.      The subject premises are identified by the location address of "10827 S.

Calle Verde Yuma, Arizona 85367", owned by Plaintiff "Thomas O. Park" in

virtue of a deed recorded in Yuma County Arizona (see Exhibit 'A').

5.      Joining Plaintiff Thomas O. Park is property trustee *ad litem*, undersigned

as "Mike Johannes", by nomination of the lead Plaintiff. The Property being

located in Yuma Arizona and the real owners are also in Arizona State, name the

Defendant above captioned residing and organized in the diverse State of

California, being "Wells Fargo Bank, N.A." at 420 Montgomery Street, San

Francisco, California 94104.

6.      The question relates to real title in the subject premises (which are also

identified by parcel no. 701-26-037, Yuma County Arizona), seeking "quiet title"

and damages against the actions of "Wells Fargo Bank, N.A. " styled as a

"Mortgage Backed Certificate Trustee" relating to *Green Point Mortgage Funding*

*Trust Series Issue 2005-AR4* " c/o "JPMorgan Chase", residing at 8181

Communications Parkway, Bldg. C, Floor 3, Mail Code TXW-2303, Plano, TX

75024.

7.      This suit further names the ostensible "Power of Sale Trustee" as an

additional Defendant, being the law firm of "Tiffany & Bosco, P.A.", located at

2525 E. Camelback Road  7th Floor, Phoenix, Arizona 85016, and in their capacity

as an Arizona Officer of the State Court.

8.      Naming as well a State of Arizona Attorney, the Firm Partner or Associate

who subscribed both the "Trustee Sale Deed" and every related lawsuit in the

State Court, one "Leonard J. MacDonald" Arizona Bar ID# 014228, professional

address of 2525 E. Camelback Road  7th Floor, Phoenix, Arizona 85016.

9.      Because the "Tiffany & Bosco, P.A." law firm and all of its Attorneys are of

necessity State Court Officers, the action implicates a "Sec. 1983" Civil Rights

violation in the nature of "Official Oppression", where they have defrauded the homeowner of his title and slandered his property rights.

10.     "Tiffany & Bosco, P.A." through "Leonard J. McDonald, an Arizona Court Officer", brought an action in "Forcible Detainer" on the strength of the attached "Trustee's Deed Upon Sale", which is at Exhibit 'B'.

11.     This 'Forcible Detainer' Action is attached at Exhibit 'C', and it was filed on 26 July 2017 at case no. **S-1400-CV-2017-00563** in the Yuma County Arizona Superior Court, recently removed into this United States District Court for Arizona at case no. **2:18-cv-02360-SPL**.

12.     The Court is requested to "Quiet Title" in the underlying Mortgage Bond that relates to "Exhibit B", which on a plain reading purports to sell the real property for the payment or cancellation of "$265,000" in mortgage related debt, "pro tanto" to the underlying obligation.

13.     It is well settled that the "mortgage follows the note", and that the mortgage without a note or the related debt obligation is by itself a 'nullity', being a security given only to guarantee the lien. See *Carpenter v. Longan,* **83 U.S. 16 Wall. 271 (1872):** *"The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity."*

4

14.     Therefore this Suit seeks to determine whether "Tiffany & Bosco, P.A."
through a State Court Official "Leonard J. McDonald, AZ Bar ID# 014228 " had
any right to exercise a "Power of Sale" and foreclose the "mortgage debt" by
selling it to the highest bidder, which in this case was written at Exhibit "B" to
appear as the fictitious lien-holder, styled "Structured Asset Mortgage
Investments II Inc. Green Point Mortgage Funding Trust Mortgage Pass-Through
Certificates, Series 2005-AR4".

15.     Noting further that this style only identifies a CERTFICATE, and not an
actual "trust" entity. The "Sale Purchase Deed" attached at "Exhibit B" is an
impossible statement of priority, an impossible statement of purchase, and an
impossible statement of "pro tanto" exchange, designed to bewilder and defraud
the "least sophisticated consumer", in violation of the Fair Debt Collection
Practices Act, Title 15 U.S.C. §1692 et seq.

16.     "Wells Fargo Bank, N.A." is not a "trustee" of the "Green Point Mortgage
Funding Trust", which went out of business in 2009 after the famous "2008
mortgage collapse". The use of the word "Trust" in the caption and naming styles
is designed to fool and sham the "least sophisticated consumer", and apparently
the rest of the country too.

17.     According to the legend and style of both the "Deed" at "Exhibit B", and
the "Forcible Detainer" action at "Exhibit C", taking it all at face value "Wells

Fargo Bank, N.A." of California was a securitization trustee, a "corporate role" that has nothing to do with owning or holding notes, obligations, deeds or carrying out any "power of sale". These potentials are scientifically known to lie in a "mortgage servicer", not the "corporate trustee".

*https://library.wilmingtontrust.com/corporate-institutional/*
*role-of-the-trustee-in-asset-securitization*

**Ensuring title and perfection of security interests** *"The trustee will see to establishing the trust that will serve as the SPV for the asset securitization. The trustee also must confirm that the trust has received clear title to the assets, free of any claims or charges, actual or implied. When assets are transferred to the SPV at closing, these assets are pledged to the holders of securities issued by the SPV. Since the assets will serve as collateral for the repayment of the securities, the trustee must also confirm that security interests in the assets are perfected in order that the assets will not be vulnerable to the claims of other creditors of the company—that is, they will be **"bankruptcy remote**." The trustee usually accomplishes this by requiring legal opinions that the security interest has been perfected."*

18.     See again for example, attached Exhibit "D", an industry report entitled *"The Trustee's Role in Asset-Backed Securities"*, denying the entire premise that any such "trustee" would ever be in the position taken by "Wells Fargo Bank, N.A." through its counsel "Tiffany & Bosco, P.A.", who are also the only signatories to

6

the actual "Purchase Receipt Deed" at "Exhibit B" and the only Verification in the

State Court "Forcible Detainer" action at "Exhibit C".

19.     Notice again at Exhibit "D", a published refutation of the premise that any

"Corporate Trustee" or a "Securitization Trustee" or an "Indenture Trustee"

would have anything to do with foreclosure, modification, notes, debt

obligations or mortgages. ("*The Role of the Corporate Trustee by U.S. Bank*")

20.     In fact, the whole thing is just a greasy swindle by the law firm of "Tiffany

& Bosco, P.A.", acting through the signature of one "Leonard J. McDonald, State

of Arizona Attorney", who is also named as a defendant here. They wrote and

filed the phony and impossible "trustee's sale deed" in Yuma County Arizona,

attached at "Exhibit B" for reference.

21.     Only "Tiffany & Bosco, P.A." brought the preposterous, obstreperous

"Forcible Detainer" action at case no. **S-1400-CV-2017-00563** in the Yuma County

Arizona Superior Court, recently removed into this United States District Court

for Arizona at case no. **2:18-cv-02360-SPL** and it is only their signature that

moves the related state court action. It is otherwise unverified at all by anyone

else.

22.     No rights of possession are written into the "Deed of Trustee's Purchase

Sale" at "Exhibit B", it is specifically "no warranty" and "no covenant", failing to

convey any "possession, use, occupancy", any "rights and ways and liberties", any "hereditaments, claims, equities or demands" etc.

23.     There is no <u>immediate</u> right to occupy or possess land "following" a Trustee's Sale, who only grants a nominal deed at "no warranty, no covenant" in exchange for the highest bidder in satisfaction of the mortgage debt, without conveyance of any possessory rights. Yet we are now <u>threatened</u> with "Forcible Detainer" as though the magic voodoo of this "Trustee's Sale" suddenly granted away our possession, our equity of redemption, and the mortgagor's title.

24.     It must be held a Federal Question implicating substantive due process and equal protection whether the strictly administrative action of recording a "no warranty no covenant" sale purchase receipt deed that writes no further possession or occupancy will sustain an action of 'Forcible Detainer' in the State Court of Yuma County Arizona.

25.     This United States Court must enter a "Declaratory Judgment" on the rights and legal procedure implicated by the Arizona State Court action and the "Forcible Detainer" law as it relates to "occupants" or "tenants" after foreclosure, granting a "Restraining Order" against the State Officials who have brought the Yuma County 'forcible detainer' action at "Exhibit C".

26.     This Court must enjoin further prosecution in the related State Court action without the plaintiff "Wells Fargo Bank, N.A." first obtaining an Order in

Quiet Title establishing their client's abstract rights of possession in the subject premises , and who must then establish its *immediate* rights to possess.

27.     It is denied that "Wells Fargo Bank, N.A." was ever assigned a "Power of Sale", because it is <u>implausible</u> from the beginning; no one would assign the securities clerk a "Deed of Trust", and it could not possibly hold the 'evidence of debt', being the original or assignment of a 'promissory note'.

28.     It is a naked, open fraud on the County Records, a base slander of our property title, and the basis for an egregious violation of our civil rights in the state court 'forcible detainer' action. 'Wells Fargo Bank, N.A.' does not stand in privity to the holder of any underlying mortgage debt, and it could not buy the real property *pro tanto* in exchange for the obligation except in relation to the real mortgage creditor.

29.     The defendant "Wells Fargo Bank, N.A. as Securitization Trustee" will never hold more than a mere abstract, ministerial deed. They cannot gain our equity of redemption by a mere trustee's sale and they cannot foreclose on our rights without due process. Ergo, they cannot get possession without first extinguishing our rights by Court Order, including the right to pay.

30.     See *Brobst v. Brock*, 77 U.S. 10 Wall. 519 (1870) which states at syllabus point four:*"An irregular judicial sale made at the suit of a mortgagee, **even though no bar to the equity of redemption**, passes to the purchaser at such sale all the rights of*

*the mortgagee as such."* The sale was "irregular" by naming a fictitious capacity who could not have held the right to payment in the underlying obligation.

31.        The real lien-holder of that 'mortgage debt' cannot be a *certificate.* Bonds, Stocks and Shares do not hold rights to anything, these are only the things itself. A securitization Trust is an investment vehicle traded on Wall Street that holds equitable and derivative shares of income generated by mortgage payments, which must come through the actual and legal holder of the mortgage rights.

32.        To speak of "Structured Asset Mortgage Investments II Inc. Green Point Mortgage Funding Trust, 2005-AR4 Mortgage Pass-Through Certificates" is like saying "*Ford Motor Car Company Focus Brand Automobiles 2005*". It is a make, model, year and description of a thing, not a "trust" or a person.

33.        The name describes a mortgage backed securities investment *product.* "Wells Fargo Bank, N.A." cannot have purchased the real property "on behalf" of a *thing,* being here an ostensible "share certificate series". The series cannot own property, it **is** property. Wells Fargo Bank, N.A. did not hold the mortgage debt.

34.        The "Green Point Mortgage Funding Trust Series" is a development vehicle, that was a registered Security on the SEC exchange system, see Exhibit "E" attached. It is a share in an investment, not an entity or person capable of suit, it cannot plead or implead. It was a SERIES, it is the equitable interest in the installment of mortgage payments quantified in a traded derivative form.

10

35.     Not only does a "derivative form" stand nowhere and it is not susceptible of service, process or entity, but it is only an <u>equitable interest</u>, not a <u>legal title</u>. An equitable interest cannot sue for possession of premises, it cannot assert a claim for payment, and it cannot be exchanged *pro tanto* without consent of the legal owner. This Court must establish the LEGAL OWNER of the mortgage debt and its related security deed.

36.     The Court must 'quiet title' on the mortgage obligation, and establish who it is that actually holds this "debt", if anyone does at all. Especially where it has become the subject of 'securitization', and where this non negotiable mortgage instrument was "endorsed" by a commercial banking actor and converted in to *current legal tender money.*

37.     As stated under the FDPCA Title 15 U.S.C. §1692 et seq., the "nature of the debt" is related to its "Fair Debt Collection Practice", and the nature of this debt must also be determined in "Quiet Title". Ostensibly, any mortgage debt would have been endorsed by a commercial banking actor, lending its franchise strength into United States legal tender, as currency, notes, bills, bonds and other issues.

38.     It is simply a scientific fact that all "bank debts" are *monetized*, and that this 'mortgage debt' must bear an endorsement stamp that shows the payee and current holder of the instrument, see memorandum attached. Only the Mortgage

Servicer is likely to hold the claims of mortgage debt, and they are nowhere to be found. It is not clear from the caption or the "deed" who was the Servicer.

39.     State law and Federal law will treat this issue as a "negotiable instrument", therefore this Court must "quiet title" on the monetized mortgage obligation to determine its discharge, or payment, or deposit, dishonor or refusal, as it relates to the mortgage title in the land. How did Wells Fargo Bank, N.A. get into it?

40.     The "mortgage debt" was necessarily paid in the act, "pro tanto" as a circulating medium of legal tender currency. The "endorsement" by a "commercial banking actor" gave monetary strength to the instrument, thereby suspending the payment or obligation of "mortgage debt". Just as any debt may be paid by check, draft or other currency, the acceptance of a demand instrument in lieu of actual payment makes for proper substitution of the obligation.

41.     We pay our debts for example with a check, until the check is returned, cashed, refused, dishonored, etc., it is deemed "paid" in the meanwhile. Failure to present the negotiable mortgage note for payment is fatal to any later claim for the payment of debt. See UCC § 3-501 "Presentment".

42.     The Defendants are challenged to a "Proof of Claim", and to show privity and standing in relation to the real holder of the mortgage debt, and the restriction or mark-out of the "specialty" mortgage note, unless it is otherwise still in circulation. They cannot have both the land securing the note **and** the

12

negotiable mortgage note itself, which is a "bill of exchange". A "failure to exhaust the legal or administrative remedy", and it is a breach of our property rights.

43.      We have always been entitled to assert the equity of redemption against the real holder of the mortgage obligation, and in order to establish this character, it must be first determined who is the proper party, really interested in that claim and capable of taking payment. The current holder appears unknown.

## WHEREFORE

a)      The Parties are Diverse by residence whether in the State of California as to "Wells Fargo Bank, N.A." and to the State Officials who are Court Officers in Arizona, under "sec. 1983 Civil Rights".

b)      If the law firm and such are not proper parties, the matter remains diverse through the different State residence of the State Court Plaintiff Wells Fargo Bank, N.A. And the question implicates some "$265,000" of mortgage debt, well over the "$75,000" threshold. See the "trustees deed" that is attached as Exhibit 'B'.

c)      The Court must "quiet title" on the mortgage debt obligation and thereby "quiet title" on the Trustee's Deed of Sale dated 19 June 2017 into "Wells Fargo Bank, N.A.", who is not a "trustee" of anything, but only standing in a ministerial corporate role.

d)    Because "Wells Fargo Bank, N.A." is only standing as the "ministerial certificate securitization trustee", their deed must be restricted to name only, without conveying possessory rights or occupancy.

e)    Because "Wells Fargo Bank, N.A." of California could not and did not have any legal right to payments under the related mortgage obligation, they cannot have purchased the real property at 10827 S. Calle Verde in Yuma, Arizona 85367 *pro tanto* to any mortgage obligation.

f)    "Wells Fargo Bank, N.A." had no credit to spend at any trustee's sale. This made a 'fraudulent conveyance', and the Court is requested to "quiet title" in the Plaintiffs as to the subject premises, or to otherwise restrain their limited "no warranty no covenant" purchase receipt deed. It is more than likely the Plaintiffs will prevail on the merits, and the State Court action is causing irreparable harm for us (we live in the house in Yuma County).

g)    Meanwhile it is no prejudice at all to the Defendants, who are congenitally incapable of taking possession anyway (a banking intermediary in California). Even if the Defendants were "granted" possession tomorrow the house would only lie empty until it was sold.

h)    Therefore this Court is requested to enter injunctive relief, restraining the Defendants in the State Court action at case no. **S-1400-CV-2017-00563** in the Yuma County Arizona Superior Court, and barring the action itself on the grounds that "immediate possession" could not inure to the Defendant's title as it now stands.

14

i)   And therefore finding that the Plaintiffs could not have owned the right to "immediate possession" at the commencement of the state action. In the alternative, that this Court will issue a **"temporary restraining order"** against the State Court action until resolution of this case.

j)   The Plaintiffs assert the <u>equity of redemption</u> against the related mortgage obligation and the deed of trust-security, and this Court is requested to establish the ownership of that debt so that it may be paid accordingly, and to order a "constructive trust" in furtherance of that payment plan.

k)   "Treble Damages" are requested against the Defendants, joint and several, to be assessed and determined by the Court, after a Trial by Jury of our peers in this community.

l)   The Court is requested to grant all further relief as may be due in law and equity, including to consider and act on the implicit "Sec. 1983" Civil Rights violations.


Further we sayeth naught.

Dated : 11 September 2018

Respectfully Submitted by,

_____

THOMAS O. PARK
*Plaintiff*

_____

MIKE JOHANNES
*Plaintiff*

15

## VERIFICATION

The foregoing COMPLAINT against **WELLS FARGO BANK, N.A., *et al.*** and

REQUEST FOR INJUNCTIVE RELIEF is true, correct and complete and that it is within

my personal knowledge, information and belief, and that I will prove the same at a trial

on the merits. All statements of fact herein are made subject to the penalties for

unsworn falsification or 'perjury' at the related United States law, and that the

undersigned takes responsibility for the pleadings.


THOMAS O. PARK
in the proper person

## CERTIFICATE OF SERVICE

I hereby certify that on 25 September 2018, I filed the foregoing document with the following party:

Office of the Court Clerk
United States District Court, District of Arizona, Suite 130
401 W. Washington St., SPC – 1
Phoenix, AZ 85003-2118 12

In addition, a true and correct copy of the foregoing document will be mailed to the following parties on or about 26 September 2018:

Wells Fargo Bank, N.A.,
420 Montgomery Street
San Francisco, California 94104

Structured Asset Mortgage Investments II  Inc.
383 Madison Ave N.Y. 10179
ex rel Green Point Mortgage Funding Trust Series 2005-AR4 , SEC # 1334842

JP Morgan Chase Bank, N.A.
Attn: Jennifer A. Stevens
Vice President, Assistant General Counsel
8181 Communications Parkway, Bldg. C, Floor 3
Mail Code TXW-2303
Plano, TX 75024

Tiffany & Bosco, P.A.
Mark S. Bosco, Esq.
Leonard J. McDonald, Esq.
2525 E. Camelback Road  7th Floor
Phoenix, AZ 85016

I placed / will place all such envelopes with postage fully prepaid in the United States mail at Yuma, Arizona.

I declare under penalty of perjury under the laws of the State of Arizona that the above is true and correct.

Executed on 25 September 2018 at Yuma, Arizona.

_____

Thomas O. Park, Declarant

# PLAINTIFF EXHIBIT - A

Recording requested by:
ASAW, LLC.

```
CONFORMED COPY
2016-20510    QUIT CLAIM DEED
08/24/2016 04:35:57 PM  Pages: 2  Fees: $15.00
Requested By:ASAW LLC
Recorded By: mlopez
Robyn Stallworth Pouquette County Recorder, YUMA County AZ
```

When recorded, mail this deed and tax statements to:
Thomas O. Park
10827 S. Calle Verde
Yuma, AZ 85367

SPACE ABOVE THIS LINE FOR RECORDERS USE ONLY

## QUIT CLAIM DEED

On 24 April 2016, the GRANTOR(S),

**ASAW, LLC,** a Nevada Limited Liability Corporation, for and in consideration of: $2,500 (twenty-five hundred USD) in services rendered and other goods and valuable consideration; conveys, releases and quit claims a 100% (one hundred percent) interest to the GRANTEE(S):

**Thomas O. Park and Christine L. Park**, as Tenants In Common, the following real estate situated at 10827 South Calle Verde (Maria), Yuma, in the County of Yuma, State of Arizona:

Legal Description:

**LOT 386 MESA DEL SOL UNIT 4, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF YUMA COUNTY ARIZONA IN BOOK 10 OF PLATS PAGE(S) 54 AND 55.**

Grantor does hereby grant, bargain and sell 100% (one hundred percent) of the Grantor's rights, title, and interest in and to the above described property and premises to the Grantee(s), and to Grantee(s) heirs and assigns forever, so that neither Grantor or Grantor's heirs, legal representatives or assigns shall have, claim or demand any right or title to the property, premises, or appurtenances.

**EXEMPT pursuant to A.R.S. § 11-1134 B 7 (c).**

**Tax Parcel Number: 14-701-26-037-00-8.**

### [ SIGNATURE PAGE FOLLOWS ]

**Grantor(s) Signature:**

Dated: _4 - 24 - 2016_          Dated: _____

_____

_____

Thomas O. Park
Manager, ASAW LLC
195 Hwy. 50, #104
Stateline, NV. 89449

State of Arizona                    )

                                            )

County of _YUMA_                )

On this _24ᵗᴴ_ day of _APRIL_, 20 _16_, before me personally
appeared _THOMAS O. PARK_ (name of signer), whose identity was
proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to
this document, and who acknowledged that he / she signed the above / attached document.

WITNESS my hand and official seal.

_____          (seal)   Evelyn Garcia
Notary Public                                          Notary Public
                                                            Yuma County, Arizona
                                                            My Comm. Expires 10-08-16

Great American Title Agency

WHEN RECORDED MAIL TO :
**Tiffany & Bosco, P.A.**
**2525 E. Camelback Rd.**
**Ste. 700**
**Phoenix, AZ 85016**

2017-15581  TRUSTEES DEED
06/19/2017 10:15:14 AM Page 1 of 2Fees: $15.00
Recorded By: Norma Vasquez, Robyn Stallworth
Pouquette County Recorder YUMA County, AZ

Forward Tax Statements to :
JPMorgan Chase Bank, N.A.
3415 Vision Drive
Columbus, OH  43219

T&B File # 14-05954 Park Conv

Title Co. # 21405023

EXEMPT TRANSACTION – NO AFFIDAVIT
ARS 11-1134 (B)(1)

### TRUSTEE'S DEED UPON SALE

**Leonard J. McDonald**, as the duly appointed Trustee (or successor Trustee or Substituted Trustee), under a Deed of Trust referred to below, and herein called "Trustee", does hereby grant without any covenant or warranty to :

**Wells Fargo Bank, National Association as Trustee for Structured Asset Mortgage Investments II Inc., GreenPoint Mortgage Funding Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4**

herein called Grantee, the following described real property situated in **Yuma** County, described as :

> **Lot 386, MESA DEL SOL Unit No. 4, according to the plat of record in the office of the County Recorder of Yuma County, Arizona, in Book 10 of Plats, Pages 54 and 55.**

This conveyance is made pursuant to the powers including the power of sale conferred upon Trustee by said Deed of Trust executed **Christine L. Park a married woman** , as Trustor, recorded on **06/24/2005** as Instrument No. **2005-27408** (or Book, Page)  of the Official Records of **Yuma** County, **AZ** and  in compliance with the laws of the State of Arizona authorizing this conveyance and is effective upon the payment by the purchaser of the price bid in accordance with ARS §§ 33-810 and 33-811.

# PLAINTIFF EXHIBIT - B

**Page 2 of Trustee's Deed**
14-05954

Said property was sold by Trustee at Public auction on June 15, 2017, at the place named in the Notice of Trustee's Sale. "Grantee", being the highest bidder at such sale, became the purchaser of said property and made payment thereof to said Trustee for the amount bid, namely $260,528.00, which payment was made either entirely in cash or by the satisfaction, protanto, of the obligation then secured by said Deed of Trust, together with the foreclosure and expenses relative thereto.

IN WITNESS WHEREOF, Leonard J. McDonald, as Trustee, has this day caused his name to be hereunto affixed.

_____
Leonard J. McDonald

State of Arizona       )
                                )ss.
County of Maricopa   )

On this _16th_ day of _June_____, 20_17_ before me, Judy Quick, a Notary Public for said State, personally appeared Leonard J. McDonald personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

JUDY QUICK
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission Expires
April 20, 2021

# PLAINTIFF EXHIBIT - C

1

## TIFFANY & BOSCO
### P.A.

2

**SEVENTH FLOOR CAMELBACK ESPLANADE II**
3
**2525 E. CAMELBACK ROAD**
**PHOENIX, ARIZONA 85016**
**TELEPHONE: (602) 255-6000**
4
**FACSIMILE: (602) 255-0192**

5
Mark S. Bosco
State Bar No. 010167
6
Leonard J. McDonald
State Bar No. 014228
7
Attorneys for Plaintiff
Evictions@tblaw.com
8
17-02496/SMChittenden

9

## IN THE SUPERIOR COURT OF ARIZONA

10

## IN AND FOR THE COUNTY OF YUMA

11

| | |
|---|---|
| Wells Fargo Bank, National Association, as Trustee for Structured Asset Mortgage Investments II Inc. GreenPoint Mortgage Funding Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4 | Case No.: ~~S1400CV2~~ 01700563 |
| | S U M M O N S |
| | Forcible Detainer after Trustee's Sale pursuant to A.R.S. {12-1173.01,et seq.} |
| ·Plaintiff, | |
| vs. | |
| Christine Park; John Does I-X, JOHN DOE OCCUPANT1-5 AND JANE DOE OCCUPANT 1-5, | |
| Defendant. | |

21
IN THE NAME OF THE STATE OF ARIZONA TO THE DEFENDANTS

22
    YOU ARE HEREBY SUMMONED and commanded to personally appear and answer the

23
Complaint of the Plaintiff in the above-captioned action at the court room of Commissioner _Dis 3_

24
_Honorable Larry Kenworthy_ of the Yuma County Superior Court _Yuma Az_ _250 W. 2nd St._ Ste. _____

25
Courtroom _3045_ , _Yuma_ , Arizona, on the _10th_ day of _August_ , 2017,

26
at the hour of _2:30 P_.M. and telephone number is _928-817-4077_ . You are hereby notified

that if you do not then and there personally appear and answer Plaintiff's Complaint, Judgment by default will likely be taken against you, granting the relief specifically requested in the Complaint, including removing you from the property.

By its Complaint, the Plaintiff seeks to recover, among other things, possession of the following described property:

Lot 386, MESA DEL SOL Unit No. 4, according to the plat of record in the office of the County Recorder of Yuma County, Arizona, in Book 10 of Plats, Pages 54 and 55.

Also described as:

10827 S Calle Verde Yuma, AZ 85367

Requests for reasonable accommodation for persons with disabilities should be made to the court as soon as possible.

The Residential Information Sheet that is attached as **Exhibit A** contains information that may be applicable to your case.

SIGNED AND SEALED this 26th day of July , 2017.

LYNN FAZZ
Clerk of the Superior Court


DONNA SHEPARD
Deputy Clerk

# RESIDENTIAL EVICTION INFORMATION SHEET

### (PUBLICATION AND DISTRIBUTION REQUIRED BY THE ARIZONA SUPREME COURT)

**Notice.** A landlord must provide a tenant with written notice saying why the eviction process has started. The tenant should have received this notice before this lawsuit was filed or with the summons.

**Rent cases.** If this lawsuit has been filed for not paying rent, the tenant can stop it and continue living in the residence by paying all rent now due, late fees, attorney's fees and court costs. After a judgment has been granted, reinstatement of the lease is solely in the landlord's discretion. Inability to pay rent is not a legal defense and the judge cannot give more time to pay, even if the tenant is having financial problems.

**Before Court.** Eviction cases move through the court system very quickly. If the tenant disagrees with the landlord's allegations, the tenant is encouraged to file a written answer. The answer form available from the justice court allows the tenant to admit or deny the allegations and explain his or her position. If the tenant cannot afford to pay the answer fee, he or she may apply for a waiver or deferral of that fee. If a tenant believes that the landlord owes him or her money, the tenant may under some circumstances file a counterclaim. The summons states that a trial will occur on the date listed, but due to the high volume of cases, a trial may not occur then. If the tenant fails to appear, and the landlord or his attorney is present, a judgment will probably be entered against the tenant. Tenants can represent themselves or arrange for lawyers to represent them. The court will not provide a lawyer.

**At Court.** At the time and date listed on the summons, the judge will start calling cases. If both parties are present, the judge will ask the tenant whether the complaint is true. If the tenant says "no", he or she will need to briefly tell the judge why. If the reason is a legal defense, the judge will need to hear testimony from both sides and make a decision after a trial. After talking to the landlord or its attorney, a tenant may wish to agree to what the landlord is requesting by signing a "stipulation". A stipulation is an agreement under which the parties resolve the dispute on the basis of what the agreement says. Only matters contained in the written agreement can be enforced. These agreements should be clear and understandable by both parties. Most stipulations include judgments against tenants.

**Continuances.** Either party may ask that the court date be delayed. The court will agree only if there is a very good reason. A delay will be no more than three business days. There is no assurance a delay will be granted and parties should come to court prepared for trial and bring necessary witnesses and documents.

**After a Judgment.** If a landlord receives a judgment, it may apply for a writ of restitution to remove the tenant(s) and all occupants. Writs of Restitution are served by constables, who will direct the residents to leave. A tenant may avoid the difficulties associated with a writ of restitution by vacating the property and returning the keys to the landlord. This ends the tenants' possession of the residence. A tenant will have five (5) days to vacate the premises unless the court has found a material and irreparable breach of the lease by the tenant, in which case the tenant has only twelve (12) to twenty-four (24) hours to vacate. A judgment will probably appear on a tenant's credit report for several years. Parties wishing to appeal from a judgment have five days to do so after the judgment is entered and can obtain forms and information from the court filing counter. If a tenant wants to remain in the rental home during the appeal, the tenant must also pay an appropriate bond and continue to pay rent into court as it becomes due. If the tenant prevails the court will dismiss the case. Absent an appeal, the tenant will need to obtain the landlord's approval and enter a new lease to continue living in the residence.

**Sources of Additional Information.** You can get copies of the Arizona Residential Landlord Tenant Act, the Arizona Mobile Home Parks Residential Landlord and Tenant Act and the Long Term Recreational Vehicle Rental Space Act from a library or from the Secretary of State's office or web page: www.azsos.gov. In Maricopa County if you wish to consult an attorney, you may want to contact the Arizona State Bar Attorney Referrals Line at (602) 257-4434 or Community Legal Services at (602) 258-3434. Contact the court in other counties for similar referrals. You can obtain a summary of the obligations of landlords and tenants on the web page for justice courts in Maricopa County: www.superiorcourt.maricopa.gov/justicecourts/info.

# TIFFANY & BOSCO
### P.A.
**SEVENTH FLOOR CAMELBACK ESPLANADE II**
**2525 E. CAMELBACK ROAD**
**PHOENIX, ARIZONA 85016**
**TELEPHONE: (602) 255-6000**
**FACSIMILE: (602) 255-0192**

Mark S. Bosco
State Bar No. 010167
Leonard J. McDonald, Jr.
State Bar No. 014228
Attorneys for Plaintiff
Evictions@tblaw.com

17-02496/SMChittenden

FILED

2017 JUL 26  PM 2: 11

CLERK OF SUPERIOR COURT
YUMA, ARIZONA

## IN THE SUPERIOR COURT OF ARIZONA

## IN AND FOR THE COUNTY OF YUMA

| | |
|---|---|
| Wells Fargo Bank, National Association, as Trustee for Structured Asset Mortgage Investments II Inc. GreenPoint Mortgage Funding Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4 <br><br> Plaintiff, <br><br> vs. <br><br> Christine Park; John Does I-X, JOHN DOE OCCUPANT1-5 AND JANE DOE OCCUPANT 1-5, <br><br> Defendant. | Case No.: S1400CV201700563 <br><br> COMPLAINT <br><br> Forcible Detainer after Trustee's Sale pursuant to \A.R.S. {12-1173.01,et seq.} |

### YOU ARE BEING SUED TO BE EVICTED FROM THE RESIDENCE.

### PLEASE READ CAREFULLY

Plaintiff alleges:

1.      Plaintiff owns real property located in Yuma County, Arizona and seeks to recover possession of that real property.

2.     Defendants are residents of Yuma County and the events referred to in this Complaint giving rise to this action took place in Yuma County, Arizona.

3.     Pursuant to the power of sale provided by a Deed of Trust dated June 13, 2005, the following real property (the "Property") was sold by the Trustee and purchased for valuable consideration by Plaintiff on June 15, 2017.

> Lot 386, MESA DEL SOL Unit No. 4, according to the plat of record in the office of the County Recorder of Yuma County, Arizona, in Book 10 of Plats, Pages 54 and 55.

> Also described as:     10827 S Calle Verde
> Yuma, AZ 85367

4.     The Property is located within the judicial precinct of Yuma County, Arizona.

5.     Pursuant to the Trustee's Sale, a Trustee's Deed was executed and delivered to Plaintiff, who thereby became the owner and party entitled to exclusive possession of the Property. A true and accurate copy of the Trustee's Deed is attached as "Exhibit 1".

6.     On or about July 10, 2017, Defendant received Plaintiff's written notice demanding possession of the property. The Notice was properly delivered to Defendant pursuant to A.R.S. § 12-1173.01. A true and accurate copy of the Notice is attached as "Exhibit 2" and "Exhibit 3". See also "Exhibit 4".

7.     At all times since the Trustee's Sale, Defendant has continuously occupied and is presently in wrongful possession of the Property without Plaintiff's consent. Defendant has failed or refused to surrender possession of the Property after receipt of Plaintiff's written demand for possession and is guilty of forcible detainer.

8.     Plaintiff is entitled to immediate possession of the Property and all fixtures and permanent improvements located thereon.

WHEREFORE, Plaintiff prays for Judgment against Defendant, jointly and severally, as follows:

A.      For a Judgment immediately terminating Defendant's right to possession and awarding Plaintiff the right to immediate possession of the Property and all fixtures and permanent improvements located thereon.

B.      For an order to the clerk of the Yuma County Superior Court to issue a Writ of Possession six calendar days after rendition of Judgment to the Sheriff of Yuma County, Arizona commanding the Sheriff to immediately restore possession of the Property to Plaintiff from Defendant and any person holding or claiming a right to possession under Defendant or otherwise;

C.      For Plaintiff's reasonable attorneys' fees and court costs incurred in an amount not less than $500.00; and

D.      For such other and further relief as the Court or jury deems just and proper.

DATED this 20th day of July, 2017.

TIFFANY & BOSCO, P.A.

By: _____
Mark S. Bosco
Leonard J. McDonald, Jr.
Seventh Floor Camelback Esplanade II
2525 E. Camelback Road
Phoenix, Arizona 85016
*Attorneys for Plaintiff*

Park/17-02496

# VERIFICATION

STATE OF ARIZONA )
)ss.
County of Maricopa )

I, Leonard J. McDonald being first duly sworn upon oath deposes and says:

That I am the attorney for the Plaintiff in the above entitled action and I am authorized to make this Verification in Plaintiff's behalf; that I have read the foregoing Complaint and know the contents thereof; and that the statements and allegations contained therein are true and correct to the best of my present knowledge, except as to those matters stated upon information and belief and as to those I believe them to be true.

_____
Leonard J. McDonald

SUBSCRIBED AND SWORN before me this 20th day of July, 2017, by Leonard J. McDonald.



_____
Notary Public

Great American Title Agency

WHEN RECORDED MAIL TO :
Tiffany & Bosco, P.A.
2525 E. Camelback Rd.
Ste. 700
Phoenix, AZ 85016

2017-15581  TRUSTEES DEED
06/19/2017 10:15:14 AM Page 1 of 2Fees: $15.00
Recorded By: Norma Vasquez, Robyn Stallworth
Pouquette County Recorder YUMA County, AZ

Forward Tax Statements to :
JPMorgan Chase Bank, N.A.
3415 Vision Drive
Columbus, OH  43219

T&B File # 14-05954 Park Conv

Title Co. # 21405023    */,

EXEMPT TRANSACTION – NO AFFIDAVIT
ARS 11-1134 (B)(1)

## TRUSTEE'S DEED UPON SALE

**Leonard J. McDonald,** as the duly appointed Trustee (or successor Trustee or Substituted Trustee), under a Deed of Trust referred to below, and herein called "Trustee", does hereby grant without any covenant or warranty to :

**Wells Fargo Bank, National Association as Trustee for Structured Asset Mortgage Investments II Inc., GreenPoint Mortgage Funding Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4**

herein called Grantee, the following described real property situated in **Yuma County**, described as :

> **Lot 386, MESA DEL SOL Unit No. 4,  according to the plat of record in the office of the County Recorder of Yuma County, Arizona, in Book 10 of Plats, Pages 54 and 55.**

This conveyance is made pursuant to the powers including the power of sale conferred upon Trustee by said Deed of Trust executed **Christine L. Park a married woman** ; as Trustor, recorded on **06/24/2005** as Instrument No. **2005-27408** (or Book, Page) of the Official Records of **Yuma County, AZ** and  in compliance with the laws of the State of Arizona authorizing this conveyance and is effective upon the payment by the purchaser of the price bid in accordance with ARS §§ 33-810 and 33-811.

EXHIBIT \

**Page 2 of Trustee's Deed**
14-05954

Said property was sold by Trustee at Public auction on June 15, 2017, at the place named in the Notice of Trustee's Sale. "Grantee", being the highest bidder at such sale, became the purchaser of said property and made payment thereof to said Trustee for the amount bid, namely $260,528.00, which payment was made either entirely in cash or by the satisfaction, protanto, of the obligation then secured by said Deed of Trust, together with the foreclosure and expenses relative thereto.

IN WITNESS WHEREOF, Leonard J. McDonald, as Trustee, has this day caused his name to be hereunto affixed.

_____
Leonard J. McDonald

State of Arizona       )
                                   )ss.
County of Maricopa  )

On this _16th_ day of _June_____, 20_17_ before me, Judy Quick, a Notary Public for said State, personally appeared Leonard J. McDonald personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

> JUDY QUICK
> Notary Public · State of Arizona
> MARICOPA COUNTY
> My Commission Expires
> April 20, 2021



**TIFFANY**
**& BOSCO**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016
TELEPHONE: (602) 288-7809
FACSIMILE: (602) 255-0192

**Financial Services Eviction Department**
(602) 288-7809

## NOTICE OF DEMAND FOR POSSESSION

July 10, 2017

**Christine Park**
AND/OR OCCUPANTS
10827 S Calle Verde
Yuma, AZ 85367

RE:   Our File No.:  17-02496

Notice is hereby given that a Trustee's sale of the property located at 10827 S Calle Verde, Yuma, AZ  85367 was held on June 15, 2017.  The new owner of the property is Wells Fargo Bank, National Association as Trustee for Structured Asset Mortgage Investments II Inc., GreenPoint Mortgage Funding Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4, by JPMorgan Chase Bank N.A., as Attorney in Fact.  The Trustee's Sale terminated any right you may have had to possession of the property.

Pursuant to A.R.S Section 12-1173.01, demand is hereby made that you surrender possession by vacating the property no later than July 17, 2017. If you fail or refuse to vacate the property by July 17, 2017, a lawsuit will be brought against you requiring your removal from the property by the Sheriff of Yuma County.  The lawsuit will also seek to recover the rental value of the property from the date of the Trustee's Sale to the date you vacate or are forcibly removed, plus attorney's fees and court costs.

Additionally, A.R.S. Section 33-806 provides that should you cause <u>any</u> damage to the property, an action can (and will) be brought against you to recover money damages for the damage caused to the property.

## IMPORTANT NOTICE TO SERVICEMEMBERS AND THEIR DEPENDENTS:
## PROTECTIONS UNDER THE SERVICEMEMBERS CIVIL RELIEF ACT

If you are a servicemember on "active duty" or "active service," or a dependent of such a servicemember, you may be entitled to certain legal rights and protections, including protection

EXHIBIT 2

from eviction, pursuant to the Servicemembers Civil Relief Act (50 USC App. §§ 501-596), as amended, (the "SCRA") and, possibly, certain related state statutes.  Eligible service can include:

1.  active duty  (as defined in section 101(d)(1) of title 10, United States Code) with the Army, Navy, Air Force, Marine Corps, or Coast Guard;

2.  active service with the National Guard;

3.  active service as a commissioned officer of the National Oceanic and Atmospheric Administration;

4.  active service as a commissioned officer of the Public Health Service; or

5.  service with the forces of a nation with which the United States is allied in the prosecution of a war or military action.

6. Service with the National Guard or a state militia under a state call to duty.

Eligible service also includes any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause.

If you are such a servicemember, or a dependent of such a servicemember, you should contact Samantha M. Chittenden at 602-255-6012 or email SMChittenden@tblaw.com to discuss your status under the SCRA.

**SHOULD YOU FAIL TO VACATE BY THE DATE REFERENCED ABOVE LEGAL ACTION WILL BE INSTITUTED.**

**FOR MORE INFORMATION PLEASE CONTACT:**

**Tiffany & Bosco, P.A.**
**Financial Services Eviction Department**
**Eviction Team Member: Samantha M. Chittenden**
**Direct Line: 602-255-6012**
**E-mail: SMChittenden@tblaw.com**



**TIFFANY**
**& BOSCO**
P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016
TELEPHONE: (602) 288-7809
FACSIMILE: (602) 255-0192

Financial Services Eviction Department
(602) 288-7809

## NOTICE OF DEMAND FOR POSSESSION

July 10, 2017

**HAND DELIVERED**
**Christine Park**
AND/OR OCCUPANTS
10827 S Calle Verde
Yuma, AZ  85367

RE:   Our File No.:  17-02496

Notice is hereby given that a Trustee's sale of the property located at 10827 S Calle Verde, Yuma, AZ  85367 was held on June 15, 2017.  The new owner of the property is Wells Fargo Bank, National Association as Trustee for Structured Asset Mortgage Investments II Inc., GreenPoint Mortgage Funding Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4, by JPMorgan Chase Bank N.A., as Attorney in Fact.  The Trustee's Sale terminated any right you may have had to possession of the property.

Pursuant to A.R.S Section 12-1173.01, demand is hereby made that you surrender possession by vacating the property no later than July 17, 2017. If you fail or refuse to vacate the property by July 17, 2017, a lawsuit will be brought against you requiring your removal from the property by the Sheriff of Yuma County.  The lawsuit will also seek to recover the rental value of the property from the date of the Trustee's Sale to the date you vacate or are forcibly removed, plus attorney's fees and court costs.

Additionally, A.R.S. Section 33-806 provides that should you cause any damage to the property, an action can (and will) be brought against you to recover money damages for the damage caused to the property.

### IMPORTANT NOTICE TO SERVICEMEMBERS AND THEIR DEPENDENTS:
### PROTECTIONS UNDER THE SERVICEMEMBERS CIVIL RELIEF ACT

If you are a servicemember on "active duty" or "active service," or a dependent of such a servicemember, you may be entitled to certain legal rights and protections, including protection from eviction, pursuant to the Servicemembers Civil Relief Act (50 USC App. §§ 501-596), as amended, (the "SCRA") and, possibly, certain related state statutes.  Eligible service can include:

EXHIBIT 3

1.    active duty  (as defined in section 101(d)(1) of title 10, United States Code) with the Army, Navy, Air Force, Marine Corps, or Coast Guard;
2.    active service with the National Guard;
3.    active service as a commissioned officer of the National Oceanic and Atmospheric Administration;
4.    active service as a commissioned officer of the Public Health Service; or
5.    service with the forces of a nation with which the United States is allied in the prosecution of a war or military action.
6. Service with the National Guard or a state militia under a state call to duty.

Eligible service also includes any period during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause.

If you are such a servicemember, or a dependent of such a servicemember, you should contact Samantha M. Chittenden at 602-255-6012 or email SMChittenden@tblaw.com to discuss your status under the SCRA.

**SHOULD YOU FAIL TO VACATE BY THE DATE REFERENCED ABOVE LEGAL ACTION WILL BE INSTITUTED.**

**FOR MORE INFORMATION PLEASE CONTACT:**

**Tiffany & Bosco, P.A.**
**Financial Services Eviction Department**
**Eviction Team Member: Samantha M. Chittenden**
**Direct Line: 602-255-6012**
**E-mail: SMChittenden@tblaw.com**

## IN THE SUPERIOR COURT OF ARIZONA
## IN AND FOR THE COUNTY OF YUMA

| | |
|---|---|
| Wells Fargo Bank, National Association as Trustee for Structured Asset Mortgage Investments II Inc., GreenPoint Mortgage Funding Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4, by JPMorgan Chase Bank N.A., as Attorney in Fact <br><br>    Plaintiff, <br>      vs. <br><br> Christine L. Park  ; JOHN DOE OCCUPANT 1-5, AND JANE DOE OCCUPANT 1-5, <br>     Defendants. | T&B File No.: 17-02496/SMChittenden <br><br><br> CERTIFICATE OF DELIVERY OF "7" DAY NOTICE OF DEMAND FOR POSSESSION <br><br><br> Forcible Detainer after Trustee's Sale pursuant to A.R.S. Sec. 12-1173.01, et seq. |

I, _Matthew Umbower_ certify that I received the following document:

7-Day Notice of Demand for Possession from TIFFANY & BOSCO, P.A., on the July 10, 2017.

That I personally delivered said document upon those named below, in the manner and at the time and place shown:

☐ UPON: Those persons living at 10827 S Calle Verde, Yuma, AZ  85367.  The person the 7-Day Notice of Demand for Possession was delivered to and who is in possession is _____, Delivery made _____, 2017 at _____ am/pm.

☑ UPON: Those persons living at 10827 S Calle Verde, Yuma, AZ  85367, were not home at the time of delivery.  The "7" Day Notice of Demand for Possession was taped to the front door on _July 10th_, 2017 at _3:47_ am/~~pm~~.

**I certify the foregoing is true and correct:**

_M B a_                                   Date: _7/11/17_

EXHIBIT 4

1

# TIFFANY & BOSCO
### P.A.

2

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 E. CAMELBACK ROAD

3

PHOENIX, ARIZONA 85016
TELEPHONE: (602) 255-6000

4

FACSIMILE: (602) 255-0192

Mark S. Bosco

5

State Bar No. 010167
Leonard J. McDonald

6

State Bar No. 014228
Attorneys for Plaintiff

7

Evictions@tblaw.com
17-02496

8

FILED

2017 JUL 26  PM 2: 10

CLERK OF SUPERIOR COURT
YUMA, ARIZONA

## IN THE SUPERIOR COURT OF ARIZONA

9

## IN AND FOR THE COUNTY OF YUMA

10

| | |
|---|---|
| Wells Fargo Bank, National Association, as Trustee for Structured Asset Mortgage Investments II Inc. GreenPoint Mortgage Funding Trust 2005-AR4, Mortgage Pass-Through Certificates, Series 2005-AR4 | Case No.:   S1400CV201700563 |
| | CERTIFICATE OF COMPULSORY ARBITRATION |
| Plaintiff, | Forcible Detainer after Trustee's Sale pursuant to A.R.S. {12-1173.01,et seq.} |
| vs. | |
| Christine Park; John Does I-X, JOHN DOE OCCUPANT1-5 AND JANE DOE OCCUPANT 1-5, | |
| Defendant. | |

18

The undersigned certifies that the largest award sought by the complainant, including punitive

19

damages, but excluding interest, attorney's fees and costs does exceed limits set by Local Rule for

20

compulsory arbitration.  This case is not subject to the Uniform Rules of Procedure for Arbitration.

21

DATED this 20th day of July, 2017.

22

TIFFANY & BOSCO, P.A.

23

24

BY_____

25

Mark S. Bosco
Leonard J. McDonald

26

*Attorneys for Plaintiff*

# PLAINTIFF EXHIBIT - D
DEFENDANT EXHIBIT 'A' CASE # S1400-CV-201700563

**November 9, 2010**

## The Trustee's Role in Asset-Backed Securities
*—By the American Bankers Association, Corporate Trust Committee*

### Executive Summary

In this position paper, the Corporate Trust Committee is responding to current assertions that the obligations of trustees in asset-backed securities[1] ("ABS") are greater than the duties contractually undertaken by those trustees.

These assertions, which have been made by participants in the ABS market by investors, investment advisors, rating agencies and others[2], fail to recognize the legal limitations on the duties of ABS trustees and have been made in response to both disappointing ABS investment performance and market issues arising from the current economic crisis. Although ABS investment performance has been disappointing, particularly with respect to certain residential mortgage-backed securities, and there were numerous market issues which gave rise to the current crisis, it is the position of the Committee that the contractual role of the trustee was *not* a contributing factor to either the investment performance or the market issues which may have caused or affected it.[3] Moreover, in many instances, ambiguities or errors in the transaction documents governing impaired asset-backed securities have been construed in ways that were not contemplated or bargained for by the original transaction parties and that seek to alter the role and potential liability of trustees to a degree not warranted either by the contractual language or applicable statutory and common law.

As a basic principle, the Committee acknowledges the need for more clarity in transaction documents generally going forward. However, the Committee's position is that any issues that were neither contemplated by nor addressed in the documents governing current ABS transactions must be resolved in accordance with the legal contracts governing those transactions and generally accepted rules of contractual interpretation. Reliance on clear hindsight, even with the goal of protecting particular constituencies or investors generally, to impose duties retroactively on trustees that are clearly outside the range of duties undertaken in their contracts effectively abrogates those contracts and violates basic tenets of U.S. contract law.

---

[1] For purposes of this position paper, the term "ABS" will include residential and commercial mortgage-backed securities, collateralized debt and loan obligations and the securities issued by structured investment vehicles, by asset-backed commercial paper conduits and in other structured finance transactions backed by financial assets, whether involving fixed or revolving funding, static or dynamic collateral or funded or synthetic exposures,

[2] See, e.g., Moody's Investors Service, Inc., Structured Finance Special Report, "Moody's Re-examines Trustees' Roles in ABS and RMBS," February 4, 2003, and "White Paper on Reforming the Asset- Backed Securities Market," Association of Mortgage Investors, March 2010.

[3] See Fitch Ratings Ltd. Asset-Backed Securities Non-Rating Action Commentary, "Seller/Servicer Risk Trumps Trustee's Role in US ABS Transactions," February 24, 2003. ("Recently, ABS trustees have come under fire from some in the market who have suggested that performance issues for certain ABS transactions reflect failures by the trustees. Fitch Ratings believes this misses the mark. While the trustee can play an important role in an ABS deal, Fitch believes that unrealistic reliance on trustees increases the risk to investors by potentially masking other more important considerations when evaluating structured finance investments. Specifically, Fitch believes it is important to consider the critical role played by the seller/servicer in ABS transactions, which is heavily dependent on the stability of their business model and their financial viability. In addition, cash flow stresses should include appropriate servicing fee scenarios, and post-closing transaction performance and servicer financial health should be followed closely. Focusing of these key areas, in Fitch's view, is a more effective way for ABS investors to mitigate risk than any dramatic change in the trustee's role might provide.")

The first necessity for every debt security is certainty in its terms. For corporate and municipal debt securities this means clear drafting of the issuer's promise to pay. For asset-backed securities, this means clear drafting of the provisions which establish the trustee's security interest in the financial assets backing those securities and the provisions for converting payments due on the assets into payments to the related security holders. The duties performed by a trustee in connection with an issue of asset-backed securities (e.g., receiving data and collections from servicers, maintaining trust accounts, making calculations, remitting funds and distributing information) are integral to the terms of the asset-backed securities.  Consequently, those duties should be explicitly set forth in the applicable transaction documents so as to establish clear expectations and avoid any misunderstanding of duties by investors or other interested parties.  As transaction documents evolve to reflect enhanced roles for certain parties, (including trustees), as necessary to address emerging market issues, clear delineation of those roles and the attendant duties will be needed so that the terms of the new asset-backed securities will be unambiguous and not subject to misinterpretation.

This paper begins with an introduction of its authors, considers the historical development of the role of the indenture trustee and describes typical asset-backed securities transactions, including the parties who generally have the greatest knowledge of and control over the assets. It discusses in detail the limited role of the trustee in asset-backed securities transactions and how that role derives from the transaction documents.  It further addresses mortgage loan servicing considerations within the context of the continuing issues in the mortgage market and misunderstandings by market participants of the limited role of ABS trustees.

## I.  Introduction

The Corporate Trust Committee (the "Committee"), a committee of the American Bankers Association, focuses on the role of banks in providing corporate trust products and services to corporate, institutional and governmental clients. Its purposes include member education, providing a forum for their concerns and representing their interests.  The Committee currently is composed of representatives of thirteen major banking institutions that provide corporate trust services, including acting as trustees for asset-backed securities.  Together, these institutions provide trustee services for over 98 percent of all asset-backed securities.[4]  The Committee believes that the views expressed herein reflect the views of virtually all trustees for asset-backed securities.

*Purpose of This Paper.*  This paper is an update to a White Paper on the role of the trustee in asset-backed securities transactions which was issued by the Committee in 2003. The goal of the Committee is to update and set in proper perspective the trustee's role in relation to ABS transactions, particularly within the context of the significant market changes which have occurred over the last few years, and to address certain market perceptions concerning the trustee's role which diverge from the traditional understanding of the trustee's contractual, statutory and common law duties.  This paper also explores in greater detail the role of the ABS trustee as "owner" or "assignee" of individual mortgage loans or other financial assets held by the trusts.

## II.  Development of the Role of the Indenture Trustee

*Brief History.*  The use of corporate trustees in the United States arose with railroad bonds in the nineteenth century.  Extremely simple documents of a few pages developed over decades of use and litigation into long documents with extensive provisions that attempted to eliminate uncertainty as to

---

[4] Securities Industry and Financial Market Association data shows that approximately $2.4 trillion of ABS, including automobile, credit card, home equity, manufactured housing, student loans, equipment leases and CDO/CLO, was outstanding at the end of the first quarter 2010 and approximately $9.1 trillion of mortgage-backed securities, including agency (GNMA, FNMA, FHLMC, etc.), and other residential and commercial mortgage-backed securities, was outstanding at that time.

terms.  Trustees accepted only ministerial duties for the convenience of the issuer, such as authenticating and paying bonds. At the time nearly all bonds were bearer bonds, so few records were needed.  The terms of the bonds were largely contained in the bonds themselves.  The terms "indenture" or "deed of trust" were applied to the documents pursuant to which bonds were issued because they generally followed a trust format: the issuer granted interests in property to the trustee to secure the issuer's obligation to repay the bonds.  This style was adopted even where the debt was unsecured.  The issuer's general obligation to repay the bonds was granted in trust to the trustee for the benefit of the bondholders.[5]

*Trust Indenture Act of 1939.*  The first widespread test of corporate indentures came about with the Great Depression. Hearings in the 1930's by then SEC Commissioner William O. Douglas, among others, uncovered instances where a trustee's action or inaction resulted in harm to bondholders.[6]  In the reforming spirit of the times, it was felt that public investors needed more protections than the market place had provided them.[7]  As a consequence, the Trust Indenture Act of 1939 (the "Trust Indenture Act") was adopted.[8]  It imposes on trustees subject to the Trust Indenture Act, regardless of any contractual protections, the requirement that, after a default with respect to the indenture securities, the trustee must protect the interests of the holders with the same degree of care that a "prudent man" would use with respect to his own interests.[9]  Trustees could not be relieved from liability for their own negligence or willful misconduct.[10]  Nevertheless, trustees would not be liable "except for the performance of such duties as are specifically set out in such indenture"[11] and could "conclusively rely . . . upon certificates or opinions conforming to the requirements of the indenture."[12]

The Trust Indenture Act is applicable to non-governmental debt publicly sold in the United States, but not other debt, such as privately placed securities.[13]  Its provisions, which were required until 1990 to be quoted verbatim in the indentures to which it was applicable, form a core of boilerplate language that infuses indentures even where the Trust Indenture Act is inapplicable.  Some state statutes, such as New York's Streit Act and various state Blue Sky laws, have inspired the addition of similar boilerplate language in indentures to which the Trust Indenture Act is not applicable. The prudent man standard of care established in section 315c of the Trust Indenture Act is the industry standard for trustees post default for corporate, municipal and structured finance debt issues.  This standard has been in place for over 60 years and has served to guide the conduct of trustees in post default circumstances.  That standard elevates the trustee's responsibilities to a more proactive role post default to use the same degree of care and skill in exercising its rights as a prudent person would, under the particular circumstances, in order to enforce obligations and pursue remedies on behalf of the bondholders as provided for in the trust documents.  In certain private placements, the trustee may be more limited in its activities due to the required direction of private investors who wish to exert a higher degree of control and as reflected in the specific trust documents.  Such limitation of the prudent man standard is not the prevailing model for the majority of structured finance transactions.

*Model Debenture Indenture.*  In 1971, the American Bar Foundation published the Commentaries on Indentures (the "Commentaries").  It resulted from a long-term American Bar Association committee project representing issuers, underwriters, trustees and governmental interests. The Commentaries contained a model indenture derived from a long evolution in standardized indenture documentation that

---

[5] Smith, Chase and Morison, "The Trust Indenture Act of 1939 Needs No Conflict of Interest Revision," 35 The Business Lawyer 161, 163-63 (1979).  See generally American Bar Foundation, Commentaries on Indentures 4-10 (1971).
[6] Hearings Before Subcommittee of the Committee on Interstate and Foreign Commerce, House of Reps., 75th Cong., 3rd Sess., on HR 10292, April 25, 1938, at 30 *et seq.* (remarks of Commissioner Douglas concerning, among other things, hearings in which he had previously participated).
[7] See TIA (defined in note 6 *supra*), Section 302.
[8] Act of August 3, 1939, 53 Stat.1149, 15 USC Sections 77aaa-77bbbb, as amended (the "TIA").
[9] TIA, Section 315(c).
[10] TIA, Section 315(d).
[11] TIA, Section 315(a)(1).
[12] TIA, Section 315(a)(2).
[13] TIA, Section 304(b).

had become the prevailing influence on indenture drafting long before its publication. Among many other provisions, the model indenture contained in the Commentaries included standard provisions on the rights, duties, obligations and immunities of the trustee. These provisions were carefully crafted to provide the trustee with the protections customary in the financial marketplace without violating the Trust Indenture Act. They limited the duties of the trustee to those expressly stated (until default when the statutory prudent man standard became applicable), exonerated the trustee for all but its negligence or bad faith, provided for reliance by the trustee on various issuer and expert certifications and provided other protections. These standard provisions appear in hundreds of thousands of indentures and similar instruments, including the documents relating to asset-backed securities transactions.

*The Reform Act.* The Trust Indenture Reform Act of 1990 (the "Reform Act")[14] remains the only substantive amendment to the Trust Indenture Act. The Reform Act, among other things, changed the time when a trustee's conflicting interests are judged for purposes of disqualification of the trustee. Under the pre-1990 Trust Indenture Act, the existence of any of nine specified "conflicting interests" at any time while indenture debt was outstanding required cure or resignation by the trustee. After the Reform Act, a "conflicting interest" exists only when default under the indenture is pending and one of the specified conflicts also exists. The SEC proposed and Congress enacted this change because they believed that a trustee's pre-default role is only administrative.[15] This change made disqualifying trustee conflicts applicable to a trustee at substantially the same time as the prudent man standard becomes applicable to the trustee. It implicitly recognizes that, before any default occurs under an indenture, a trustee has no duties under the indenture other than the duties it has explicitly undertaken to perform.

*The Trustee.* The virtually universal inclusion in indentures of standard provisions protecting and exonerating the trustee reflects the economic realities of trustees' relationships to debt offerings. Trustees are usually named late in the preparation of a transaction (with accordingly limited ability to negotiate terms) and are paid relatively small fees to act as trustees in transactions involving large sums of money. A trustee's willingness to act is premised upon its documented understanding that the trustee can have no liability in the transaction except for its own negligence or willful misconduct in carrying out its prescribed duties or for breach of contract claims. Thus, trustees require indemnification and a lien against trust assets for their expenses in enforcing the indenture and defending themselves against claims.

## III. Asset-Backed Securities Transactions

*Brief History.* Current asset-backed securities transactions (as distinguished from traditional mortgage indentures that granted physical security under mortgages mostly for railroads and utilities) developed in the 1980's from such predecessors as project finance, sale-leaseback and tax-exempt municipal financing. The initial draftsmen were experienced with traditional indentures for corporate and municipal debt and the passive roles performed by trustees under those indentures prior to any default. However, certain structural features of asset-backed securities transactions, primarily the absence in most such transactions of an operating issuer, inclined the draftsmen to make the trustee's pre-default role more active.

*Structure.* In a typical asset-backed securities transaction, a seller transfers receivables, securities or other assets in either of two ways. A trustee may receive the assets in exchange for pass-through certificates evidencing beneficial ownership interests in such assets. Alternatively, a Delaware statutory trust or another limited purpose entity (a "special purpose vehicle" or "SPV") organized by the sponsor of the ABS transaction[16] may purchase the assets with proceeds from its notes or other debt

---

[14] Act of November 15, 1990, Pub. L. 101-550, 104 Stat. 2713.
[15] Senate Report 101-155, The Securities Acts Amendments of 1989, October 18, 1989, at 32-35 ("[T]he Commission has stated that, in the absence of default, the indenture trustee's duties are essentially ministerial . . . ." at 32).
[16] Regulation AB (see *infra* at footnote [17]) defines "sponsor" as the person who organizes and initiates an asset-backed securities transaction. This person may be the seller.

instruments and pledge such assets to a trustee to secure the debt instruments.  The seller of the assets or the SPV may sell the certificates or debt instruments directly or through underwriters to investors.  A pooling and servicing agreement, trust indenture or similar agreement forms the basic document which sets forth the relationship among the parties and the assets.

*Sellers.*  In most asset-backed securities transactions, the seller (or originator, depositor or other sponsor) assembles the pool of financial assets backing the securities by purchasing them or arranging for them to be acquired. The seller then describes the financial assets in offering materials and sells the securities backed by them to investors. The seller, in conjunction with underwriters or private investors, determines the structure, drafts the documents and prices the transaction. The seller selects the other transaction participants, including the underwriter, if any, the servicer and the trustee.  It may also sell the securities to investors and it, or an affiliate, may act as servicer.   At the initiation of an asset-backed securities transaction, the seller will know more about the assets and structure of the transaction than any other participant.  In some cases the seller will have continuing obligations with respect to the pool of assets, such as an obligation to add or replace assets if the assets in the pool drop below certain value thresholds.  In other cases the seller will have no contact with the pool of assets once the transaction is closed.  The seller may benefit from the initial sale of the assets to the trust or SPV and from the sale of securities issued by the trust or SPV to investors, as well as from any ongoing relationships that the seller or its affiliates may have with the transaction.

*Underwriters.*  The seller may select one or more underwriters to purchase the asset-backed securities and resell them to investors.  Underwriters, their counsel and other experts conduct a "due diligence" review of the assets, the structure of the transaction and the parties involved to obtain comfort and protection under the securities laws that the prospectus or other sales document is accurate. In some cases the underwriter controls the seller of the assets and is primarily responsible for the structure and assets in the transaction. Underwriters sell the securities and then have no further relation to the transaction.  Consequently, they have little interaction with trustees.

*Servicers.*  The servicer is appointed as an independent contractor who performs its servicing obligations for the benefit of the transaction investors.  Servicer duties are specified in the applicable servicing agreement and generally are performed in accordance with certain accepted servicing practices (as defined under the agreement).  In connection with these duties, the servicer's fee is typically structured as a percentage of the outstanding balance of the asset pool.  Servicing duties are carried out either directly or through subservicers, and involves managing the underlying assets deposited with the trust or SPV in the asset-backed securities transaction.

The servicer typically collects all the income from the assets, enforces the assets as needed and may perform any evaluations needed to substitute assets.  Following the end of each collection period, as defined in the ABS transaction documents, the servicer reports to security holders (often through the trustee) information on collections and other summary information about how the assets are performing. This information is used to determine the payment stream to holders of ABS and the allocation of losses, if any. The servicer may also determine allocations of funds to reserves and/or to purchase additional assets. The trustee applies the funds delivered to it from the servicer, as instructed by the servicer and provided in the transaction documents, to pay interest and principal on the securities, to fund reserve accounts and purchases of additional assets, and to make other payments including fees due to the ABS transaction participants.

Additionally, as required by recent federal legislation, servicers evaluate and approve mortgage loan modifications, short sales and other default resolution strategies to mitigate losses in connection with defaulted assets.  To the extent enforcement of the assets involves a foreclosure action, the servicer undertakes these actions in the trustee's name as the secured party but is fully responsible for all associated activities including the engagement of counsel, eviction proceedings, property maintenance, and sale or disposition of properties following foreclosure.

Thus, in most asset-backed securities transactions, the seller and the servicer have more knowledge about and, in the case of the servicer, control over the assets, asset performance and the

transaction generally than any other transaction participant.  In many asset-backed securities transactions, the document may not contemplate any direct check on the performance of the seller or the servicer.   Transaction documents virtually *never* give the trustee any substantive oversight of the seller or the servicer and their activities other than to confirm the timely receipt by the trustee of certain remittances and reports from the servicer, including reports of independent accountants, and certifications in the forms required by the transaction documents. Additional oversight is not explicitly required of trustees and would necessarily be limited to matters that are readily ascertainable and verifiable on a cost and time sensitive basis. Importantly, the trustee typically has no duty under the transaction documents to make investigations on its own for the purpose of detecting defaults, fraud or other breaches.

If the servicer becomes insolvent or unable to perform, the trustee may be responsible under the transaction documents for the appointment of a successor servicer.  Some transaction documents contain specific provisions relating to "back-up" servicing, *i.e.*, appointing a specified successor servicer from the outset to take over servicing when succession becomes necessary.  These provisions range from "cold" back-up servicing, where the trustee agrees in the transaction documents to become the successor servicer (a servicer of last resort) unless another entity (appointed by the trustee when needed) accepts such appointment, to "hot" back-up servicing, where a successor servicer named in the transaction documents agrees to maintain back-up files throughout the transaction. In transactions where the trustee accepts the role of back-up servicer, the trustee typically relies upon arrangements with servicing units within its own institution or with third party providers to pre-arrange succession.

*Trustees.*  The trustee in an asset-backed securities transaction may perform various functions, including serving as indenture trustee, authenticating agent, issuing and paying agent, securities registrar and transfer agent and calculation agent with respect to the securities, custodian of the assets (on behalf of the issuer), analytics provider and back-up servicer. "Trustee" as used herein, unless otherwise specified, includes all such roles performed by the trustee in an asset-backed securities transaction (but not the role of servicer, back-up servicer or master servicer).

The trustee of an asset-backed securities transaction typically performs more numerous and complex duties than trustees for traditional corporate and municipal debt transactions. The asset-backed securities trustee's ability to accept these expanded duties within its role and compensation depends on the clear expression of such duties in the transaction documents and the applicability of the provisions thereof to properly limit the trustee's liability for their performance.

## IV.  Regulation of Asset-Backed Securities

*Regulation AB.*  In December 2004, the Securities and Exchange Commission ("SEC") published comprehensive final regulations addressing registration, disclosure and reporting requirements for asset-backed securities.[16]  Among other things, the regulations require specific disclosure regarding ABS transaction counterparties in transactions registered with the SEC, including trustees, sponsors, depositors, issuing entities, servicers, originators and others.  Consistent with the economic reality of the trustee's role as being ministerial in nature, the regulations require only basic, limited, summary disclosure regarding the trustee.  Indeed, the SEC did not even propose a separate definition of "trustee," and following market commentary did not believe such a definition was necessary.

The limited disclosure for trustees stands in marked contrast to the *increased* disclosure that the regulations require for many other ABS transaction participants, including sponsors, issuing entities, servicers and related parties.  It also stands in particularly sharp contrast to the regulations' *new and materially higher* disclosure standards for significant obligors, credit enhancement providers and swap counterparties in ABS transactions due to the critical importance of these parties – as contrasted to the trustee – to the economic performance of transactions subject to the rule.

---

[16] *See* Securities Act Rel. No. 8518 (Dec. 22, 2004), available on the Internet at http://sec.gov/rules/final/33-8518fr.pdf.

At this writing, the SEC has proposed revisions to both Regulation AB and asset-backed securities generally  that would impose substantial changes in the offering process and disclosure and reporting requirements for ABS (the "Proposal").[17]   In a lengthy release that emphasizes the need for improved investor protection in the wake of the financial crisis, the SEC issued the Proposal because "[t]he recent financial crisis highlighted that investors and other participants in the securitization market did not have the necessary tools to be able to fully understand the risk underlying those securities and did not value those securities properly or accurately."  However, even though the Proposal is a direct result of the financial crisis and it substantially increases disclosure concerning pool assets, servicers, originators, cash flow models, repurchase demands, and other items, the Proposal requires no additional disclosure concerning trustees

## V.   The Asset-Backed Securities Trustee

*Transaction Documents.*  The principal document in most asset-backed securities transactions is a pooling and servicing agreement, indenture or similar contract governing the securities pursuant to which the securities are issued and the trustee serves. The transaction documents normally provide for events of servicer default, additional events of default ("acceleration events" in pooling and servicing agreements), and limits on enforcement rights only to rights against the assets dedicated to the asset-backed securities transaction (not against the seller) or performance obligations of contractual parties. Additional agreements may detail the roles of the servicer and other parties and may contain specified additional duties for the trustee.

The responsibilities of the trustee, as set forth in typical asset-backed securities transaction documents, whether a pooling and servicing agreement or an indenture, are narrowly circumscribed as to each role and are traditionally stated to be limited to those expressly accepted by the trustee.  These duties are ministerial in nature and do not require the trustee to verify, investigate or monitor the actions of the seller or the servicer (other than in instances of a breach or a default as further described below). Lastly, in tacit recognition that the trustee's duties are so circumscribed, asset-backed securities transaction documents usually provide for expert input from independent accountants or others in circumstances where information needs to be audited or verified and actions at the direction of specified requisite percentage of holders (contingent upon providing trustees with indemnity sufficient to cover such actions contemplated).  Trustees are virtually never required or invited to exercise independent discretion in the transaction documents.

Under Trust Indenture Act-qualified transaction documents, during the continuance of a default, the trustee must exercise its rights and powers under the transaction documents for the benefit of the holders of the asset-backed securities in the same manner that a prudent person would exercise such rights and powers for his or her own benefit.  Lastly, these provisions are generally only relevant to the extent the trustee has actual knowledge of a default (or a breach which, to the extent not cured, will mature into an event of default) and specific actions or remedies are clearly prescribed under the transaction documents.

*Basic Duties of the Trustee.*  In most asset-backed securities transactions, the roles and basic duties of the trustee are specifically detailed in the transaction documents and may consist of the duties for the following capacities.

1.  As *assets custodian*, the receipt, safekeeping and release of the assets;

2.  As *analytics provider*, the performance of certain, specified analysis and reporting of related data provided thereto;

---

[17]   The proposing release is available at http://www.sec.gov/rules/proposed/2010/33-9117.pdf.

3. As *account custodian*, the receipt, maintenance and segregation of funds derived from the asset;

4. As *paying agent*, the release of those funds as payments to holders and for other purposes; and

5. As *trustee*, the holding of a lien on the assets for the benefit of holders, the circulation of certain information to holders, the exercise of certain remedies for the benefit of investors as specified and/or directed by a controlling majority and the replacement of the servicer.

Additionally, the trustee performs certain traditional duties in respect of the asset-backed securities (authenticating agent, registrar and transfer agent for the asset-backed securities issued under the indenture or pooling and servicing agreement). Although some of these tasks may be complex, they are all ministerial in nature and not discretionary. Trustees accept these duties in reliance upon provisions in transaction documents that limit trustee performance liability to negligence and bad faith, authorize trustee reliance on the servicer for all information and indemnify the trustee.

*Asset Custodian.* The trustee usually is granted a security interest in or is the owner of the assets underlying the transaction for the benefit of the holders of the asset-backed securities. The details of the interest and the trustee's duties in respect of it are described in the transaction documents. The actual grant occurs pursuant to the transaction documents at the closing for the issuance of the asset-backed securities. In the case of physical assets or securities, the transaction documents usually require that physical possession be given to the trustee or registration of securities be made in the name of the trustee or its nominee. Where the assets are receivables, inventory or other property that may be impracticable for the trustee to hold, the transaction documents normally specify that the trustee's interest in such assets must be clearly indicated in the records of the seller or pledgor of the assets. The quality of the security interest granted ("perfected", "first priority", etc.) and the "true sale" nature of any transfer of assets may be specified in the transaction documentation. The trustee is not, however, expected to determine that a security interest of such quality has been established or that a "true sale" transfer has occurred. Instead, the trustee is authorized by the transaction documents to rely upon legal opinions or other evidence to establish at closing that what it has been granted conforms to the documents. The trustee is also authorized to rely on future opinions and instructions from others (usually the servicer or the seller) to establish that the assets are being maintained so as to preserve the trustee's interests in the assets in accordance with the transaction documents.

The trustee may be obligated under the transaction documents to determine from time to time that the aggregate value of the assets bears a prescribed ratio to the amount of the debt outstanding or to perform other analytics on the assets. The documents set forth precise valuation procedures and indices and other methods of valuation and authorize the trustee to rely upon specific sources of information. The trustee will instruct the seller or other responsible party to add assets if needed or may permit assets to be withdrawn if the amount held exceeds requirements. In each case the trustee has authority to rely on specified information as to the value and ownership of assets being added or withdrawn. The trustee may also require the substitution of new conforming assets for existing assets that have ceased to conform to the asset requirements for the transaction upon receiving notice of such failure to conform. Usually the seller or servicer will effect the substitution. The trustee will be authorized to rely upon their representations that the substitute assets meet transaction requirements. In certain transactions there is a constant or periodic flow of assets through the trustee's custody or security interest.

*Accounts.* The transaction documents usually specify a number of separate accounts in which the trustee is instructed to hold funds derived from specified sources. The servicer usually collects the funds from these sources and remits the funds to the trustee with instructions as to source and account application. Appropriately, in most asset-backed securities transactions, the trustee is authorized under the transaction documents to rely entirely upon the servicer as to the source and, usually, the allocation of the funds to particular accounts because the trustee has no independent means to investigate the servicer's information and instructions. The trustee's only duty is to keep the funds safe until their release is directed pursuant to the transaction documents by the servicer or upon the happening of an event, established by certification to the trustee.

*Payments.*  The trustee for an asset-backed securities transaction releases funds from one or more accounts upon the terms of the transaction documents to pay holders, to pay transaction participants' fees and expenses and, in some cases, to pay the costs of acquiring new assets. The trustee or the servicer usually calculates payments to holders based upon the terms of the asset-backed securities. Often an asset-backed securities transaction involves several classes of holders who are entitled to payment at different levels of priority, with some entitled to payment on a particular day only if the funds then available exceed the amounts due to others having more senior interests. If the calculation requires information not known to the trustee, the transaction documents specify that in making the payment the trustee may rely upon information provided by other transaction participants.

*Reports.*  The trustee usually provides monthly distribution reports to holders of securities, furnishes information or documents pertaining to the assets and performs tax reporting functions on distributions. In addition, in the case of publicly offered transactions, the trustee may file the periodic reports required by the Securities Exchange Act of 1934[17] on behalf of the trust, the SPV, the servicer or the seller.

*Replacement of the Servicer.* The transaction documents often make the trustee responsible for any needed succession of another entity to the role of servicer.  The transaction documents usually provide precise circumstances when the trustee must remove the servicer, such as upon the servicer's bankruptcy or material breach of its covenants. Where the transaction documents task the trustee with the administration of servicer performance standards, most trustees require that such standards be set forth in a sufficiently clear manner that the trustee may reasonably administer them.

In cases where the transaction participants or rating agencies contemplate a higher risk of replacing the initial servicer, a designated back-up servicer is appointed at the initial closing of the transaction.  The requirements of any such designated backup servicer vary depending on the servicer, transaction structure, asset class and other variables.  In some instances the backup servicer will maintain redundant real time servicing information during the life of the transaction so that it is in a position to step in at any time.  In other instances, backup servicers may only periodically receive and test back-up tapes of transaction information. The specific responsibilities of the backup servicer vary and are clearly outlined in the applicable servicing agreement.

While designated backup servicers are appointed on more transactions today than they have been historically, in many transactions servicer succession is not actively contemplated at closing.  In such cases, the transaction documents provide that the trustee will appoint a successor servicer, if needed, or will act as the successor servicer itself until another entity accepts appointment.  This arrangement is typically referred to as having the trustee act as the "servicer of last resort."

Trustees that do not wish to perform as successor servicer, following the termination of the initial servicer, may obtain an agreement from another entity that can and is qualified to act for them in order to take over servicing upon the trustee's request. This type of succession arrangement can function reasonably well when funds are set aside for transition expenses and the successor servicers' fees are adequate, or can be increased, to attract a successor servicer.

*Satisfaction and Discharge.*  Trustees are required to confirm that the discharge of indentures upon the stated maturity of the securities issued thereunder or upon the delivery to the trustee of all such securities for cancellation complies with the requirements under the transaction documents. In connection with the discharge of an indenture, the trustee ensures it receives the appropriate officers' certificates from the issuer (and, if applicable, the co-issuer) and an opinion of counsel, each stating that all conditions precedent for the satisfaction and discharge of the indenture have been satisfied. Although the provisions governing satisfaction and discharge of indentures have remained very consistent over time, trustees have recently come under pressure to discharge indentures in cases where the collateral securing the bonds has been exhausted or liquidated before the stated maturity of the bonds, which remain outstanding.

---

[17] Act of June 6, 1934, 48 Stat. 881, 15 USC Sections 78a-78jj, as amended.

## VI.   Trustee as "Owner" or "Assignee" of Mortgage Loans

Mortgaged-backed securities ("MBS") often use pooling and servicing agreements, pursuant to which an MBS trustee holds formal title to loans for the benefit of MBS investors, calculates and processes securities payments, and takes certain specific actions on behalf of investors.  Although the trustee is the legal owner of record of the mortgage loans, the trustee does not own the loans for its own account or have an economic interest in the loans.  The beneficial owners of these mortgage loans are investors in the MBS securities, who typically are large institutions such as public and private pension funds, mutual funds and insurance companies.

As is the case with all other ABS, the role of the securitization trustees in MBS transactions is limited.  The trust instruments creating MBS securities and relevant law do not give the trustee any powers or duties with respect to foreclosure, maintenance, sale or disposition of properties that are collateral for the MBS securities.  Those powers and duties are conferred exclusively on loan servicers, who generally are appointed by the depositor or seller of the loans to the MBS trust.  In fact, depending on the particular trust and pool, the trustee may have no or very limited information on either the borrower or the status of the mortgage loan. While foreclosure and any legal action with respect to trust properties must be brought in the trustee's name as the legal owner of the loans, foreclosure activity and the post-maintenance, sale and disposition of the trust properties are managed entirely by the loan servicers.  Although any claims against the trust must be brought against the trustee as the trust's legal representative,   these cases usually are defended either by the original lender who sold the loans to the securitization trust or by the loan servicer.  Occasionally, trustees will become actively involved in this type of litigation in a representative capacity to protect the interests of the investors who are beneficiaries of the securitization trusts.

As previously discussed, the servicer is an independent contractor and is fully responsible and liable to the investors in connection with the performance of all loan servicing obligations as outlined in the applicable transaction documents.  Trustees are not responsible for overseeing or monitoring the performance of the servicer other than with respect to confirming its timely receipt of remittances or any periodic reports or certificates in the required form.  To enable servicers to independently perform their servicing obligations, trustees are generally required to provide powers of attorney to the servicer and execute documents as requested or directed by the servicers in furtherance of any loan servicing activities.  In the event a servicer fails to perform its obligations, and such ongoing failure constitutes a servicer event of default, trustees may take additional action to pursue remedies on behalf of or as directed by the investors.  Absent a servicer default, the trustee has no authority to direct or approve loan servicing activities.

## VII.   Response to Assertions of Market Participants on Role of the Trustee

Contrary to recent suggestions,[19] the trustee in an asset-backed securities transaction is not like the board of directors of a company and does not owe ABS investors fiduciary duties similar to those owed by such directors.  Prior to a default, the trustee's duties are limited to those expressly set forth in the related pooling and servicing agreement, indenture or similar contract.[20]  The court in the case, *In re*

---

[19] See "White Paper on Reforming the Asset-Backed Securities Market," Association of Mortgage Investors, March 2010.
[20] See, e.g., Trust Indenture Act (TIA), § 315(a)(1), 15 U.S.C. § 77ooo(a)(1); the Commentaries § 6-1, at 248 ("Before the occurrence of an event of default, Subsection (a) [of section 315 of the TIA] requires the Trustee to perform only those duties that are specifically set forth in the indenture."); and J. Spiotto, *Defaulted Securities: The Prudent Indenture Trustee's Guide*, at IV-13 (1990).

*E.F. Hutton Southwest Properties II v. Union Planters,*[21] stated that "the corporate trustee has very little in common with the ordinary trustee. . . .   The trustee under a corporate indenture . . . has his rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement.  His status is more that of a stakeholder than one of a trustee" (quotation marks omitted).[22]  New York courts have held that New York common law governing trust indentures is consistent with the foregoing interpretations of the TIA,[23] and federal courts applying New York law have ruled similarly.[24]  The court in the case, *Semi-Tech Litigation, LLC v. Bankers Trust Co.,*[25] for instance, stated that, "[u]nder New York law, the pre-default duties of an indenture trustee . . . generally are limited to the duties imposed by the indenture.  After an event of default, the trustee is held to the prudent man standard" (citations and quotation marks omitted).[26]

Occasionally, the duty of an asset-backed securities trustee to take or refrain from taking a particular action is unclear, either because the related asset-backed securities documents are vague regarding the action to be taken or who is to take the action or because the permissibility of the action is in doubt under the terms of the documents (or for some other reason).  In many recent instances, such ambiguities have prompted trustees to interplead participants in collateralized debt obligation and other asset-backed securities transactions as to which disputes have arisen, or, where the allocation of deal assets was not contested, to file for declaratory judgment. Trustees also have been concerned about their duty and ability to accept and cancel securities gratuitously surrendered by collateralized loan obligation investors for the purpose of affecting the timing and amounts of payments on other securities comprising part of the same issuance.[27]  Additionally, trustees have been concerned about their duty and ability to cooperate in residential mortgage loan modifications under the Home Affordable Modification Program ("HAMP") established by the Secretary of the United States Treasury pursuant to the Emergency Economic Stabilization Act[28] and to treat principal forborne on those mortgage loans or reduced in amount pursuant to HAMP as a realized loss under the related asset-backed securities transaction documents.[29]

Ambiguities or gaps in ABS transaction documents have, as described in Part III above, prompted transaction participants to induce trustees to undertake duties traditionally carried out by other parties, such as servicers. In most if not all such transactions, trustees are neither appropriately compensated for doing so, nor required to acquiesce under the terms of the contract. More importantly, in contrast to other transaction parties, trustees (within their trust departments) generally do not have (nor should be presumed to have) the expertise to make substantive business decisions. Rating agencies and investors should consider alternative means of mitigating the potential for servicer mistake or malfeasance, including the appointment of a backup servicer, a credit risk manager or verification agent.[18]

Although it would not be possible to resolve any uncertainty by interpreting the transaction documents to contain terms beyond their plain meaning of their existing provisions, trustees may determine the appropriate course of action in reliance upon the standard provisions protecting and exonerating them and the principle, established in the cases discussed in  the immediately preceding paragraph and in other cases along similar lines, that the trustee's duties are limited to those expressly set forth in the transaction documents prior to a default.

---

[21] 953 F.2d 963 (5th Cir. 1992).
[22] Id at 969.
[23] See *AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.,* 11 N.Y.3d 146 (2008).
[24] *Elliott Associates v. J. Henry Schroder Bank & Trust Co.,* 838 F.2d 66, 71 (2d Cir. 1988).
[25] 353 F. Supp. 2d 460 (S.D.N.Y. 2005).
[26] Id at 472.
[27] Moody's Investors Service, Inc. Structured Finance Special Report, "Challenges in Interpreting CDO Documentation: A Summary of Moody's Observations and Responses from 2009," Part II (Note Cancellations in CLO Transactions), pp. 2 - 3, March 2010.
[28] Pub. L. 110-343.
[29] See Letter of American Securitization Forum to Michael S. Barr, Acting Under Secretary for Domestic Finance and Assistant Secretary of the United States Department of the Treasury, dated December 19, 2009.
[18] See **The Report—***Another View* infra.

## VIII. Conclusion

Trustees provide important services to the asset-backed securities marketplace under the terms of the applicable transaction documents. These duties are ministerial in nature and scope which is consistent with the limited information given to trustees and the level of compensation paid to trustees for those services. Parties in the marketplace generally have accepted the scope of the trustee's role since the enactment of the Trust Indenture Act, as evidenced by consistent terms in the relevant agreements over the last 70 years. The limited role of the trustee has not, in fact, been a contributing factor to disappointing ABS investment performance and was not a contributing factor in the current financial crisis.

Accordingly, efforts to expand the interpretation of transaction documents to retroactively impose additional non-contractual duties on trustees in light of the financial crisis are misguided. Indeed, such efforts, which may be seen as substantially altering the scope of the trustee banks' role and the extent of their potential liability relative to the holders of ABS, are not legally enforceable and would constitute unsafe and unsound practices for the banking industry. Absent trustees' consent, the reinterpretation of contractual terms to impose on trustees duties not contemplated at the inception of an ABS transaction is financially unfair to trustees, legally indefensible as an abrogation of their right of contract and destructive to the necessary certainty of debt terms that underlies successful capital markets.

*SEC Info*   <u>Home</u>   <u>Search</u>   <u>My Interests</u>   <u>Help</u>   <u>Sign In</u>   *Please **Sign In***

# GreenPoint MTA Trust 2005-AR4   NY SEC # 1334842

*1 Related Registrant:*   Structured Asset Mortgage Investments II Inc — 8/1/05 — SEC # 1243106   Go

*Click to view...*   <u>Registrant</u>   <u>About</u>   **Filings**   <u>Files</u>   <u>Relationships</u>   <u>Names</u>   <u>Topics</u>   <u>Web</u>

## 21 SEC Filings from 8/1/05 to 3/29/06 (No Filings in the Past Year)

*E-Mail:* ☐ Send me ✉ <u>notifications of *all* future Filings</u> involving **GreenPoint MTA Trust 2005-AR4**

*Most-Recent:*   <u>10-K — Annual Report — Form 10-K — for 12/31/05</u> — as Filer

*All:* List Filings filed as: ☑ **Filer** ☑ **Owner** ☑ **Issuer** ☐ Filing Agent

Find          in the most-recent Filings.   Show Docs with "hits" & each "hit".   ↓Hints

---

## Documents & Exhibits  as  Filer or Owner

| *Latest Filing* | | *Type* | *Category* | *Description* | *Documents* |
|---|---|---|---|---|---|
| 3/29/06 | OLD | <u>10-K</u> | *Reports:* | <u>Annual Report</u> — Form 10-K OLD | 1 |
| 3/16/06 | OLD | 8-K | *Reports:* | <u>Current Reports</u> — Form 8-K OLD — | 18 |
| | | | | <u>Press Releases</u> 📄 & <u>Conference Calls</u> 📞 | |
| | | | *8-K Items:* ① | | |
| 3/16/06 | OLD | ⑧ *Events:* | | • <u>Other Events</u> — Item 8.01 OLD | 18 |
| 3/16/06 | OLD | ⑨ *Financials:* | | • <u>Financial Statements and Exhibits</u> — Item 9.01 OLD | 18 |
| 1/30/06 | OLD | <u>15-15D</u> | *Reports:* | <u>Notice of Suspension of Duty to File Reports</u> — Form 15 OLD | 1 |
| | | | *General Exhibits:* 📇 | | |
| 8/16/05 | OLD | EX-10 | <u>Material Contracts</u> OLD | | 2 |
| | | | *Graphics:* 📊 📊 📈 | | |
| 8/16/05 | OLD | GRAPHIC | <u>Images, Pictures and Graphs</u> OLD | | 2 |

---

## Documents & Exhibits  as  Issuer or Subject Company

| *Latest Filing* | | *Type* | *Category* | *Description* | *Documents* |
|---|---|---|---|---|---|
| 8/1/05 | OLD | <u>424B5</u> | *Registrations:* | <u>Prospectus</u> OLD | 1 |

↑Top

---

*Copyright © 2018 **Fran Finnegan & Company**. All Rights Reserved.*
<u>*About*</u> – <u>*Privacy*</u> – <u>*Redactions*</u> – <u>*Help*</u> — Fri., Sep. 21, 5:35:41.0pm ET

# PLAINTIFF EXHIBIT - E